UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

W. HUGO VAN VUUREN,

              Plaintiff,

v.

ROPES & GRAY LLP,

              Defendant

Case No. 18-CV-10253

## **COMPLAINT**

### **Introduction**

Plaintiff W. Hugo Van Vuuren ("Van Vuuren"), a citizen of South Africa and a co-founder of the venture-capital investment fund known as Xfund, brings this action against defendant Ropes & Gray LLP ("Defendant" or "Ropes"), to recover damages from Ropes for its gross legal malpractice, breach of fiduciary duty and other improper conduct as counsel to Van Vuuren and Xfund—conduct that enabled Van Vuuren's co-founder and ostensible equal partner in Xfund, Patrick Chung ("Chung"), to seize control of this $100-million enterprise for whose very existence Van Vuuren was responsible.

It is now evident that from the time Chung originally arranged to have Ropes hired as counsel for the formation of Xfund, he anticipated that the law firm, and especially partner Aaron Katz, Chung's law school classmate and close friend, while purporting to represent the fund and thus the joint interests of partners Van Vuuren and Chung, would in reality work behind the scenes to ensure that Chung could ultimately take control of the fund. While the

Ropes lawyers for many months continued to encourage Van Vuuren to believe they were acting for the fund and to protect his interests, they *began secretly counseling his partner Chung about how to gain control over Xfund, and even drafted documents falsely stating that Van Vuuren had agreed to give Chung absolute power and control over Xfund.*

Ropes then willingly assisted Chung in concealing these false statements from Van Vuuren, and deceiving him into signing, in a rush while traveling, a set of revised partnership documents which Ropes led Van Vuuren to believe dealt only with unrelated technical matters necessary to Xfund's operation. Months later, when Van Vuuren discovered that the revisions had been hidden from him, Katz and other Ropes attorneys worked for months to cover up their vital role in the deception.

In order to avoid blame and continue secretly aiding Chung, Katz and Ropes lured Van Vuuren to deepen his reliance on them by offering him personal legal and strategic advice on the status of Xfund's governance structure and what to do about it—advice that was grossly inaccurate and designed to keep Van Vuuren from acting to correct the earlier deception, and to keep Chung's and Ropes's misconduct from being reported to Xfund's investors.

As Chung began to flex the new governance muscle that the Ropes lawyers had given him, and others within Xfund began to suffer acutely from Chung's tyrannical and abusive management, the Ropes lawyers maintained a pretense that they were seeking to "mediate" with Chung and "fix" the governance problem, and enticed Van Vuuren to confide in them about the conflict with Chung, while at the same time continuing their secret communications with Chung about how to complete his takeover of Xfund and permanently silence Van Vuuren.

Ultimately, Ropes gave up any pretense of loyalty to Van Vuuren or Xfund, and allied itself with Chung to enable him to take a series of final steps to seal his acquisition of control of the fund, including manipulating an internal investigation, filing a baseless legal proceeding to

block Van Vuuren's access to Xfund's investors, maliciously interfering with Van Vuuren's lawful immigration process, and ultimately making it impossible for Van Vuuren to reverse the damage or to salvage any meaningful role in the fund.

Ropes's conduct violated its most basic legal duties of competent representation and loyalty to Van Vuuren (and to Xfund), abetted and enabled Chung's own breaches of duty to Van Vuuren, deprived Van Vuuren of his position with and interest in Xfund, widely and perniciously damaged Van Vuuren's personal reputation, and interfered with his freedom of movement and residence, all of which resulted in life-altering economic losses for which Ropes must now be made to provide a remedy.

## The Parties

1.     Plaintiff Van Vuuren is a citizen of South Africa.

2.     Defendant Ropes is a Delaware limited liability partnership, with its principal office in Boston, Massachusetts. Upon information and belief, Ropes also has United States offices in Illinois, New York, California, and Washington, D.C.

## Jurisdiction and Venue

3.     Upon information and belief, Ropes, a limited liability partnership, is a citizen of the following states by virtue of the citizenship of its partners: Massachusetts, Illinois, New York, California, and Washington, D.C.

4.     This Court has diversity subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(2), as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of a state (Ropes) and a citizen of a foreign state (Van Vuuren), and Van Vuuren is neither a permanent resident of the United States nor domiciled in Massachusetts.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391, in that Defendant and one or more of its agents reside and may be found here; a substantial part of the events giving rise to Plaintiff's claims occurred here; and Defendant transacts business here.

6.      This Court has personal jurisdiction over Ropes because it is a resident of this District.

7.      Jurisdiction and venue are also proper in this Court and District pursuant to the express terms of the parties' engagement agreement, referenced further below.

## Background Facts: Hugo Van Vuuren

8.      Van Vuuren originally came to the United States from South Africa in 2003 to study at Harvard College, where he was admitted early-action and on a full scholarship. He earned his A.B. in Economics from Harvard, and then a Master in Design Studies (MDes) from the Harvard Graduate School of Design's Advanced Studies Program.

9.      From 2003 until mid-2017, Van Vuuren maintained a residence in Cambridge, Massachusetts, on the Harvard campus. During that time, he collaborated with leading faculty, venture capitalists, and student entrepreneurs to advance entrepreneurship and scholarship, and to create venture-funding resources for students and start-up companies.

10.      Van Vuuren was awarded multiple so-called O-1 "genius" visas by the United States Citizenship and Immigration Services, based on the agency's recognition of his "extraordinary ability" in business, through which he has achieved "sustained national or international acclaim as an entrepreneur," making him "among the few entrepreneurs at the very top of the field."

11.      While pursuing his postgraduate degree, from 2010 to 2012, Van Vuuren was a Fellow at Harvard's Berkman Klein Center for Internet and Society. He conducted research on technology, design, and innovation in the developing world. His research was funded by private

investors and by the Harvard Institute for Global Health, the MIT IDEAS Global Challenge

program, the World Bank, and the Bill & Melinda Gates Foundation. Van Vuuren also won

TED, PopTech, and Aspen fellowships for his research and entrepreneurial work.

12.     Harvard appointed Van Vuuren as an Expert-In-Residence at its School of

Engineering and Applied Sciences, and as a Scholar-In-Residence at Harvard College. He has

co-taught groundbreaking courses on entrepreneurship and design at Harvard College and at the

School of Engineering and Applied Sciences.

13.     With Harvard professor David Edwards, Van Vuuren was on a team that founded

ArtScience Labs, a widely respected international interdisciplinary organization for idea-

experimentation and exhibition in the arts and sciences, headquartered in Paris and Boston.

Active on three continents, ArtScience Labs spawned entities such as Le Laboratoire Paris,

multiple venture-backed companies, Café ArtScience in Cambridge, and The Laboratory at

Harvard, which commercialized science, funded startup companies, and developed humanitarian

interventions.

14.     Van Vuuren was also a co-founder of WB, a New York City-based enterprise-

technology venture fund spun out of the MIT Media Lab. WB's director credited Van Vuuren's

"unique ability as an entrepreneur, fundraiser, and startup driver" as "the seminal force in the

formation" of WB and its ongoing success of WB, and places Van Vuuren "at the very top of our

field." A Fortune 500 CEO agreed: Van Vuuren is "a person of extraordinary ability in the areas

of entrepreneurship and venture investment."

### 2010-14: Van Vuuren starts Experiment Fund, leads it to success

15.     In 2010, through the experience gained in his unique leadership positions in the

venture and academic communities, Van Vuuren conceived of the "Experiment Fund," an

investment fund that would be anchored at Harvard and provide seed-stage financing to top

entrepreneurial talent from Harvard and the surrounding area.

16.     With Harvard colleagues, Van Vuuren wrote the business plan for Experiment

Fund, and then worked with leading venture-capital firms—New Enterprise Associates (NEA),

Accel Partners, Breyer Capital, and Polaris Partners—along with ArtScience Labs, to capitalize

the fund in 2012.

17.     Experiment Fund was a pioneer in the "university venture-capital" ecosystem.

Van Vuuren was the fund's only individual co-founder, and the only individual to hold an

interest in its profits.

18.     Throughout Experiment Fund's existence, from 2012 to 2014, Van Vuuren was

the only partner working full-time at the fund, and was the person primarily responsible for

identifying, performing due diligence on, and managing and monitoring the fund's investments.

His work included running biweekly meetings of Experiment Fund's investment committee, as

well as managing all other aspects of the fund's operation, as well as its vision, goals, and

planning. As Harry Weller, a general partner at NEA who oversaw its investment in Experiment

Fund, put it, Van Vuuren was the fund's "on-the-ground" leader.

19.     Van Vuuren proved himself a highly successful seed-stage investor. In only two

years, Experiment Fund received more than 3,000 investment proposals and "pitches". From

these, the investment committee overseen by Van Vuuren selected approximately 100 for due-

diligence investigation, which Van Vuuren himself then led. The resulting Experiment Fund

investment portfolio grew dramatically: the average investment grew by more than a multiple of

10, and one venture, the Harvard Square-based data-analytics and machine-intelligence startup

Kensho, after being hand-picked and nurtured by Van Vuuren, has now in only a few years

grown by a multiple of 100.

20.     Jim Breyer, founder of Experiment Fund investor Breyer Capital, said that Van

Vuuren's work at the fund "contributed in substantial ways to the field of business

entrepreneurship" and that his "professional background, demonstrated talent, and

entrepreneurial achievements place him at the top few percentages in the US entrepreneurial

community."

21.     David Frankel, co-founder and managing partner of the venture fund Founder

Collective, agreed that Van Vuuren "managed... Experiment Fund alone for more than three

years," and during that time built "an impressive track record of identifying innovative and

successful investment opportunities, while maintaining ethical standards and integrity in his

dealings with... founders, investors or other counterparties."

22.     Harvard professor Douglas Melton, a member of Experiment Fund's faculty-

advisory board, remarked that Van Vuuren demonstrated "a very admirable work ethic and

investment track record," which "earn[ed] him a stellar reputation at Harvard and MIT." Melton

described having seen "in real time" how Van Vuuren "recruited and helped the founding team

of Kensho," many of whose founders "were students in residence at Eliot House where I serve as

Co-Master."

23.     Kensho's own chief architect agreed that Van Vuuren was "an irreplaceable

academic and professional mentor" whose "advice and investment" through Experiment Fund

"was instrumental in shaping Kensho's early team and culture." Van Vuuren "proactively strives

to recruit key team members and goes far and beyond to offer advice in product ideas, effective

leadership, and operational challenges."

24.     While leading and managing Experiment Fund, Van Vuuren cultivated

relationships not only within the Harvard community but also at MIT, within venture-capital

firms, and among start-up teams. He became regarded as "an expert advisor, coach, and

cheerleader for company-builders and technology executives, a fixture here in the technology

community at Harvard and MIT." An advisor to the Special Envoy of the World Health

Organization, for example, sought Van Vuuren's counsel as "an expert and unrivalled advisor"

for "understand[ing] disruptive healthcare technologies and the incubators and accelerators that

support them," and observed that while at Experiment Fund, Van Vuuren not only helped

founders access seed-capital, but also worked with his colleagues to "set in motion... a series of

strategic partnerships unheard of in the industry."

25.     The five-member investment committee that Van Vuuren led at Experiment Fund

included appointees of the fund's primary investment-community supporters, NEA, Accel, and

Polaris. NEA assigned Patrick Chung ("Chung"), a partner in its Menlo Park, California office,

to serve as one of its two representatives on the committee. At the time, Chung joined in lauding

Van Vuuren as "at the top of his field in terms of entrepreneurship and translating science- and

university-based research into successful commercial ventures." In particular, Chung said,

"relationships are critical to the success of venture funds," and "Mr. Van Vuuren is the trusted

anchor of our fund's many academic and industry ties."

### 2013-14: Van Vuuren conceives of and starts Xfund, as Chung is being forced from NEA

26.     As he continued to spearhead Experiment Fund's growth, and in response to

outside interest in his work, Van Vuuren began to envision building on its success by forming an

even-larger fund. He discussed this idea with others on Experiment Fund's investment

committee. Chung in particular expressed a keen interest in the idea, and suggested that he might

leave NEA to join Van Vuuren full-time in the new fund. Based on his work with Chung on the

Experiment Fund investment committee, Chung's own connection to Harvard as an alumnus of

the university, and Chung's venture-capital experience gained at NEA, Van Vuuren found the prospect of partnering with Chung appealing.

27.     Unbeknownst to Van Vuuren at the time, and on subsequent information and belief, Chung had an undisclosed reason for seeking the new opportunity: NEA's management had become dissatisfied with his job performance—in particular, his investments were underperforming, and senior partners were concerned about his behavior toward colleagues. Chung hid these facts from Van Vuuren and from the Experiment Fund advisors whom the two were consulting about the potential new fund.

28.     In their early discussions, Van Vuuren and Chung agreed that since each would be making significant intellectual and other contributions to the new fund—which came to be called Xfund—their partnership must be one of fundamental equality, in governance and decision-making as well as economics. When they began to market the concept of the new fund to potential investors, Chung and Van Vuuren each consistently and repeatedly represented to investors that they were equal partners. This principle of true equality was a central selling point. One of the slides in their standard presentation to anchor investors included a list of the fund's core principles, one of which was "Partner Equality. Equal Vote. Equal Carry." ("Carry" refers to fees based on a fund's performance.)

29.     Each of the two partners, investors were told, would contribute something essential to the partnership: Chung, then in his mid-forties, would leverage his Silicon Valley investment experience, while Van Vuuren, in his late twenties, would provide the dynamic potential reflected in the record-setting performance of Experiment Fund, along with an extensive and essential network of supporters, built over the course of the previous decade, within the Cambridge-area Harvard and MIT academic and entrepreneurial communities. To this core partnership, Experiment Fund's founding investors, Accel, NEA, and Polaris, would add

introductions and references to a new and expanded group of potential investors. The new fund would have two headquarters: one in Cambridge, run by Van Vuuren, and one in Menlo Park, run by Chung.

30.     Chung's professed commitment to equal partnership with Van Vuuren was, it is now clear, a sham: what he wanted was an investment fund that he alone could run.

### Spring 2014: Chung selects Ropes & Gray to represent Xfund

31.     By the spring of 2014, after discussing the new fund with Experiment Fund's investment-firm supporters, Chung and Van Vuuren were ready to proceed with formalizing the new venture, and began considering which law firm to retain to advise them. Chung, a 2004 graduate of Harvard Law School, began to push for hiring Ropes & Gray, where, not coincidentally, his law school classmate and close friend Aaron Katz was a partner. Chung and Katz had been friends since law school: they had worked together on the Harvard Law Review, and Katz had attended Chung's wedding. Katz was a white-collar criminal defense lawyer, who upon information and belief had no prior experience or expertise in private-equity law or creating or counseling venture-capital funds.

32.     Several of Experiment Fund's advisors strongly objected that Ropes lacked sufficient experience and reputation for representing venture-capital firms. But Chung ignored a list provided to him of firms known to specialize in the area, and, emphasizing Ropes's longstanding connections to Harvard, pressed to give the business to his friend's firm.

33.     By early June 2014, Van Vuuren had acceded to Chung's preference, and Ropes was hired. Katz had the matter assigned to a team of transactional lawyers in Ropes's private-equity group, including Peter Laybourn, John Wang, and others. But Katz himself, despite his lack of relevant expertise, would remain closely involved.

34.     Ropes prepared a standard-form engagement letter dated June 5, 2014, which Chung and Van Vuuren signed. The letter said that at the outset, Ropes's "joint clients" would be Van Vuuren and Chung "in [their] capacities as co-founders" of Xfund. But then once a "management company" was formed, the letter suggested, that entity would become "the sole client for this engagement." The letter added that "this engagement does not create an attorney-client relationship with the Joint Clients in their personal capacities."

35.     Katz and Ropes assured Van Vuuren that this representation arrangement was appropriate, and that the firm could fully and fairly represent Van Vuuren, Chung, and the management company because their interests were aligned. Katz assured Van Vuuren that Ropes would not represent Chung adversely to Van Vuuren, and would communicate and share all pertinent information with both partners, including copying both on all email correspondence about the fund. The engagement letter said that Ropes was "prepared to represent" both Van Vuuren and Chung "because we do not believe that [their] respective interests are or are likely to become significantly divergent." The letter continued: "We would be unable to take any position related to the joint representation on behalf of" either Chung or Van Vuuren if that position were "adverse to the interests of the other joint client." But again, the letter assured Van Vuuren that "we do not believe at this time, based on our knowledge of the facts as they have been presented, that such a situation is likely to arise."

36.     Ropes also promised in the engagement letter that "if the interests of one joint client were to diverge from those of the other joint client" concerning the subject of the representation, the firm "would, if necessary, modify or terminate our representation of the Joint Clients," and the firm would not "represent either of the Joint Clients" in any related "dispute... between the Joint Clients," though Ropes would, following its withdrawal "preserve" "any client confidences."

37.     In agreeing to retain Ropes, and for many months thereafter, Van Vuuren reasonably relied on these assurances by the firm. Van Vuuren reposed his full trust and confidence in Katz and the other attorneys Ropes assigned to work on Xfund's matters.

38.     Notwithstanding the language of the Ropes engagement letter purporting to limit its attorney-client relationships, the course of the parties' dealings in and after June 2014 was quite different. Katz and the other Ropes attorneys routinely counseled and advised both Chung and Van Vuuren, often on a daily and even hourly basis, on a variety of matters well beyond the mere formation of the Xfund entities.

39.     During the months following June 2014, the Ropes attorneys regularly interacted with Van Vuuren in a manner indistinguishable from acting as his own personal attorneys, without ever limiting the scope of the matters that could be discussed. In hundreds of emails and text messages, and dozens of telephone and in-person conferences, Katz and other Ropes attorneys continuously advised Van Vuuren on matters of legal structure, transactional strategy, ownership, control, and a host of other issues—matters that clearly affected Van Vuuren's personal interests—without ever suggesting that their ability to advise him was in any way constrained or limited by their nominal role as "fund" or "formation" counsel. During all of these interactions, Van Vuuren continued to reasonably rely on the Ropes attorneys' advice and to repose his faith, trust, and confidence in Katz and the other members of the Ropes team.

40.     Ropes drafted foundational agreements for two limited-liability companies through which Van Vuuren and Chung would manage Xfund and its investments. Consistent with the theme of fundamental equality between the partners, Ropes drafted the documents to give Chung and Van Vuuren equal ownership shares in the entities, equal rights to investment-management fees (calculated as 2.5% of the aggregate amount of capital committed by investors), and equal rights to "carry"—fees tied to the performance of Xfund's investments.

41.     Ropes also drafted the documents to provide for equal decision-making rights on investments and matters of firm governance. "All actions by the Members," Chung and Van Vuuren, on behalf of the company, Ropes wrote, "*shall be taken jointly and no Member shall act singly without the authorization of the other Member.*"

42.     Van Vuuren and Chung's previous working relationship on the investment committee of Experiment Fund had similarly operated on a consensus basis in the evaluation of investment opportunities Van Vuuren brought to the fund, and had functioned smoothly and successfully.

43.     The principle of consensus that Ropes wrote into the initial agreements was also, again, in keeping with the way Van Vuuren and Chung were at the time describing Xfund as they marketed the fund to prospective investors: as a partnership of equals. Indeed, the investors insisted that their agreements with the fund identify both Chung and Van Vuuren as "key persons," such that any significant change in the role of either would require notification to all investors and an inquiry process.

44.     Van Vuuren and Chung succeeded by the end of 2014 in raising $100 million in investor money for Xfund. As a result, under the agreements drafted by Ropes, Van Vuuren stood to be compensated handsomely, through guaranteed payments and profit-sharing potential, for the next decade.

**Fall 2014: Chung moves to secretively gain control of Xfund.
Ropes willingly assists**

45.     Notwithstanding the assurances Chung gave to Van Vuuren as they formed Xfund, notwithstanding the assurances Chung and Van Vuuren gave to companies in Experiment Fund's portfolio who vouched for them in launching Xfund, notwithstanding similar assurances given to potential Xfund investors and to key staff members as they were hired, and

notwithstanding Chung and Van Vuuren's joint success on this basis in raising $100 million in investor money, it is by now clear that from the outset Chung had little interest in equal partnership with Van Vuuren. Instead, while maintaining whatever appearance of good-faith cooperation seemed necessary for the sake of investors, behind closed doors Chung began a systematic campaign to hound, bully, and deceive Van Vuuren, and anyone on Xfund's team who supported him, until none of them had any remaining role, voice, or power in the fund.

46.     In September 2014, before the first round of investors had even signed their limited-partnership agreements with Xfund, Chung quietly instructed Ropes to change the ownership of the Xfund management company so that instead of 50%, Chung would own 60%, and Van Vuuren only 40%. Chung falsely pretended to Ropes that this had always been the partners' arrangement, and instructed the lawyers to "correct" their original drafts showing a 50-50 ownership split. The Ropes lawyers were puzzled, because this was not what they had been told originally, but they complied with Chung's instructions. This change did not affect the governance of Xfund, which remained at 50-50.

47.     Later, Chung began arguing to Van Vuuren that given the 50-50 governance power, it would be necessary to have a "tie-breaking" mechanism in the event the two of them were not able to come to agreement on an investment decision. Chung misrepresented to Van Vuuren that Xfund's investors were insisting on such a mechanism, and claimed that its absence from their partnership agreements was a "defect," on which Chung disingenuously pretended to blame on Ropes's careless drafting and which Chung said had "the capacity to paralyze" management of the fund. (In fact, equal sharing of governance was and is common, including among other comparable firms represented by Ropes at the time.)

48.     In an email exchange on the subject in December 2014, Van Vuuren responded by expressing confidence that he and Chung's would be able to reach consensus on investment

decisions as they had before in Experiment Fund. Van Vuuren also told Chung he thought the

timing was wrong to make "any major changes" in structure—they had just closed with a final

group of investors—and he suggested it might be appropriate to get a "second opinion" on the

matter from a law firm other than Ropes, and emphasized that he wanted "to be extra smart here"

about any structural changes. Chung rejected the idea of seeking a second legal opinion, but

seemed to let the investment "tie-breaker" issue drop.

49.     In fact, however, Chung was by then already proceeding in secret to enlist Ropes

to help him make far broader changes in Xfund's governance, and to do so without Van

Vuuren's knowledge or consent.

### December 2014: Ropes and Chung collude over secret governance change

50.     Chung began an email correspondence with the Ropes lawyers from which,

apparently for the first time in Xfund's work with the law firm, and in obvious contravention of

the practice followed in hundreds of communications over the prior months, Chung and Ropes

carefully excluded Van Vuuren. In one of these secretive communications, Chung referred to

what he described as a "delicate management-company question." He falsely told Ropes that it

had just been brought to his attention by "our controller" while they were "reviewing some

budget mechanics" that the management-company documents did not seem to reflect what

Chung falsely claimed was his and Van Vuuren's longstanding agreement that in a "case where

we disagree and cannot come to agreement,... I would control the vote." Indeed, Chung added

(again falsely), this "is why we agreed to split [ownership of] the management company 60-40 in

my favor." But the documents as drafted by Ropes, Chung said, "seem to imply that I cannot

break ties," and this would "allow the management company to be paralyzed in cases of

disagreement."

51.     Given that this was not at all what Van Vuuren and Chung had agreed or told

Ropes at the time of formation (and that it would have been an anomalous arrangement in any

venture-capital partnership), the Ropes lawyers' initial reaction was one of puzzlement. But their

next steps revealed where Ropes's loyalties truly lay. None of the lawyers took the obvious and

simple next step of simply asking Van Vuuren whether Chung was right in claiming that the two

partners had always agreed Chung should "control the vote." None of the lawyers asked Chung

why he had not included Van Vuuren in the conversation to begin with, or why the issue was

"delicate" if it was a matter of clear agreement between them. Instead, the Ropes lawyers took

Chung's lead and began secretly corresponding with him on the subject of how to go about

changing the governance of Xfund, without ever informing Van Vuuren of what they were

discussing.

52.     As these secret communications continued, Chung falsely told the Ropes lawyers

that he had again just then "discussed" the governance matter with Van Vuuren, and that Van

Vuuren had reaffirmed that he and Chung always intended "to install an unambiguous right for

me [Chung] to break ties for all [management company] decisions." Once again, Chung made

this claim without copying Van Vuuren, and yet the Ropes lawyers accepted Chung's false

representation without even the slightest effort to verify it with Van Vuuren.

53.     Chung secretly directed the Ropes lawyers to revise the organizational

documents. He quickly jettisoned any pretense that the revisions should be limited to mere a "tie-

breaking" mechanism for rare hypothetical cases of non-consensus on investment decisions.

Chung demanded: *"I must unambiguously be able to make decisions alone for the management

company." "All DECISIONS that are to be made by"* the management company, he wrote,

*"should belong unambiguously to me."*

54.     Even in the face of this startling demand for absolute power, the Ropes lawyers willingly bowed to Chung's demands without bothering to inform or check with Van Vuuren (much less to consider the implications for investors who had been promised a partnership of equals), and continued to communicate secretly with Chung on the subject. More such secret exchanges took place over the course of approximately a week in December 2014—even as the Ropes lawyers *were* communicating with Van Vuuren and Chung jointly, following the normal practice, on several other actively developing Xfund matters being handled by the law firm.

55.     In keeping Van Vuuren in the dark about what Chung was plotting, Ropes breached its promises to Van Vuuren in the engagement agreement, which specifically said that Ropes did not "believe that a joint representation can be undertaken properly if information disclosed by or communicated to one joint client during the joint representation must be held secret from the other joint client," and therefore Ropes would, it promised, "in general share all such information with both of the Joint Clients."

56.     Ropes's concealment from Van Vuuren also violated the clear policy and practice that the firm had followed from the start of its work with Van Vuuren and Chung, of consistently including both partners on all important business-related communications. And by engaging in such secret communications with respect to a matter obviously vital to Van Vuuren's personal interests, the Ropes lawyers breached their duties to Van Vuuren as a partner in a closely held organization such as Xfund. In failing to respond to what should have been clear "alarm bells" that Chung was himself engaged in a fraud and breach of his fiduciary duties to Van Vuuren, and failing to take easy available steps to confirm with Van Vuuren any of what Chung was claiming or demanding, the Ropes lawyers grossly breached their duties to Van Vuuren, and willingly assisted in and abetted Chung's illicit power-grab.

57.     Van Vuuren did not learn of Ropes's secret December 2014 communications with Chung on the governance issue until much later—in part because, as described further below, Ropes endeavored to hide the full story from Van Vuuren in order to cover its tracks.

58.     Van Vuuren never knowingly and willingly agreed, either orally or in writing, to grant Chung control over governance of Xfund. Indeed, there was no practical or logical reason why doing so would have been in his or Xfund's interests.

### December 18-19, 2014: Ropes colludes with Chung to misdirect Van Vuuren into unknowingly signing the revised Xfund agreements

59.     As noted, at the same time as it was secretly working on Chung's governance scheme, Ropes was working on and communicating with both Chung and Van Vuuren about a number of matters of which Van Vuuren *was* aware, including Ropes's structuring and documentation of Xfund's purchase of the original Experiment Fund investment portfolio, and Xfund's first investment in a portfolio company.

60.     There were also changes to the Xfund management company and general partner agreements to which Van Vuuren and Chung *had* agreed. They had decided to create an "options pool" to allow them to offer, when they hired executive staff, as they were indeed doing for the first time in December 2014, incentives based on fund performance. In his secret communications with Ropes about the governance change, Chung pressured the firm to quickly complete their revisions so that they could be included with the others that Van Vuuren was expecting and knew he would have to sign.

61.     Working close to midnight on December 18, 2014, Ropes finished its drafting of the governance language to give Chung control of Xfund. The lawyers' drafting was itself designed to help keep Van Vuuren from discovering and realizing the import of the change. Rather than simply modifying the statement in the original agreements that "all actions by"

Chung and Van Vuuren "shall be taken jointly" and that neither could "act singly without the authorization of the other," Ropes added a host of new provisions describing what appeared to be a complex governance bureaucracy. The lawyers first said that "management, operation and policy" would now be "vested exclusively" in a group called "the Managing Members," and that at the outset both Van Vuuren and Chung would be Managing Members. But elsewhere, the lawyers added that decisions of the Managing Members "shall require approval of the Managing Members holding a majority of the votes of all Managing Members." And only then did they add the *coup de grace*: that for this purpose *"Chung shall have two votes and Van Vuuren shall have one vote."*

62.     By the time the Ropes lawyers finished their work, Xfund's Cambridge office had closed for the holidays, and Van Vuuren himself had left Boston and was *en route* to South Africa to attend to urgent family matters. Ropes emailed the revised agreements to Chung and Van Vuuren at 11:42 p.m. Eastern time on Thursday, December 18, 2014. Ropes's cover email *made no reference whatsoever to the request for changes in governance structure or the fact that Chung was about to obtain absolute control over Xfund with two votes to Van Vuuren's one.* Instead, Ropes highlighted and referenced only a change that Van Vuuren was already expecting, relating to the "options pool" for new hires.

63.     At 10:00 a.m. the following morning, while in transit and with only his mobile devices on which to view documents, Van Vuuren affixed his digital signature to the revised agreements and returned them to Ropes as instructed. Because he reasonably believed that he had been informed of all changes to the documents, and understood and agreed with the changes, Van Vuuren did not take the time that morning to proofread the revisions before signing the documents. As a result, he did not discover—indeed, did not find until months later—the secret changes in governance made by Chung and Ropes without Van Vuuren's knowledge or consent.

64.     From December 19, 2014 until Van Vuuren's eventual resignation from Xfund in

March 2017, it was these revised documents prepared by Ropes in December 2014 at Chung's

behest on which Chung repeatedly and increasingly relied to take control of Xfund and prevent

Van Vuuren from effectively resisting Chung's abusive and destructive mismanagement.

### December 2014: Further ignoring its unethical conflicts of interest, Ropes assists Chung against Van Vuuren as to his interest in Experiment Fund

65.     Ropes's abandonment of Van Vuuren in December 2014 was not limited to its

collusion with Chung on the question of governance. One of the matters on which Ropes was

counseling Chung and Van Vuuren at the time was, as noted, the acquisition by Xfund of

Experiment Fund, the prior fund founded by Van Vuuren, and its investment portfolio. As the

founder and sole manager of Experiment Fund, Van Vuuren held an unvested equity interest in

the fund, a "carry" interest in the fund's investments, and rights to compensation under a

consulting agreement—analogous to the rights Van Vuuren would share with Chung in the

investments made by the new Xfund. In the contemplated purchase by Xfund of Experiment

Fund's portfolio, Van Vuuren was asked to simply forfeit his equity interest, his carry interest,

and his rights under his consulting agreement.

66.     Ropes never once suggested to Van Vuuren, during the period leading up to the

closing of this acquisition in December 2014, that the prospect of this forfeiture of Van Vuuren's

valuable legal interests raised an issue on which he might need legal advice.

67.     Even more stunningly, Ropes's internal system for identifying potential conflicts

of interest specifically warned the lawyers that since Van Vuuren would be adversely affected by

it, Ropes had a conflict. But the Ropes lawyers simply ignored the problem. They overrode the

conflicts report, and never disclosed the conflict to Van Vuuren. Instead, they left him to

continue relying on Ropes as the only counsel involved in the transaction. Without a lawyer's

advice, Van Vuuren simply forfeited his interests in Experiment Fund without compensation.

### May 2015: Van Vuuren learns of changes in Xfund's governance, but Katz misleads him about their significance

68.     Xfund held its annual meeting and dinner in Cambridge in early May 2015. When

Chung discovered, in the weeks before the event, that a software malfunction had caused errors

in some of the invitations, he became enraged with Van Vuuren and the Xfund staff members

who had been responsible for the invitations, hurling abuse and threatening to fire the employees.

The incident typified an emerging pattern in Chung's behavior: from his office in California, he

would react to any perceived failing or missed opportunity with emails and texts in which he

raged, belittled and sneered at whomever he thought responsible.

69.     Katz attended the May 6, 2015 Xfund annual dinner, and Van Vuuren sought his

advice about dealing with Chung's increasingly abusive behavior, which also included an

increasing tendency toward unilateral decision-making. Katz and Van Vuuren spent several

hours discussing Chung and Xfund. When the subject of governance came up, Katz said he

thought Van Vuuren and Chung continued to jointly and equally control Xfund, and that Chung

did not have the right to make decisions on his own. Katz offered to review the Xfund

agreements to confirm his understanding, and report back to Van Vuuren.

70.     The next day, May 7, 2015, Van Vuuren followed up on the conversation by

emailing Katz. This time, Van Vuuren did not copy Chung on the email—but because he

recognized that this was (at least as far as he knew at the time) a departure from established

practice between the Ropes attorneys and their clients, he asked Katz whether it was permissible

for him to share information with Katz that would be kept confidential from Chung. Katz assured

him that it was appropriate to do so.

71.     The following day, May 8, 2015, Katz emailed Van Vuuren that he had, as promised, reviewed the Xfund agreements. While doing so was clearly outside his area of practice and competence, Katz proceeded to give Van Vuuren legal advice about the proper interpretation and effect of the agreements, as originally drafted and as amended in December 2014, with respect to the issue of governance and Van Vuuren's rights as a member of limited-liability companies formed to run Xfund.

72.     Katz falsely assured Van Vuuren that Xfund remained "set up in a way that really makes this a marriage of two equals." Katz acknowledged that there were mechanisms in the documents "to ensure that there were not inefficient stalemates on day-to-day operational decisions," but Katz insisted that these applied only to issues "that aren't so significant that a disagreement would threaten the marriage." In the case of any significant issues, Katz assured Van Vuuren, "the documents are set up to practically require you and Patrick [Chung] to come to a complete agreement."

73.     Katz's advice was erroneous, and lacked any reasonable legal basis. Worse still, it was affirmatively misleading. In his lengthy email to Van Vuuren quoting and discussing various provisions of the revised agreements, Katz nowhere revealed or acknowledged to Van Vuuren the critical language that his Ropes colleagues had secretly inserted at Chung's behest and without Van Vuuren's knowledge or consent: the provision that at all decisions concerning Xfund "shall require approval of the Managing Members holding a majority of the votes," and that Chung alone now held, and was guaranteed always to retain, this "majority" of "votes"—that is, to put the matter plainly, that Chung now had absolute and permanent governance control over Xfund.

### May 2015: Chung proposes to secretly split the partnership
### and mislead Xfund's investors. Ropes continues its cover-up

74.     While Katz tried to disguise the crucial governance change from Van Vuuren,

Chung himself was less subtle: he began making more and more important decisions without

Van Vuuren's involvement, while remorselessly heaping verbal abuse on Van Vuuren and the

staff of Xfund. When Van Vuuren protested, Chung merely replied that Van Vuuren should "get

used to this new world instead of try[ing] to pretend that the old world worked."

75.     In this "new world," Chung made clear, he intended to act as if he and Van

Vuuren had undergone what Chung called a "French divorce": that is, he would minimize any

further dealings with Van Vuuren, and would conduct business without him, while pretending to

the outside world—specifically, to Xfund's investors—that they were still functioning as the

equal partnership they had sold to investors. Van Vuuren objected that, to begin with, such an

arrangement would be dishonest to the investors and in breach of the fundamental basis on which

the investors had agreed to support Xfund. Van Vuuren also alerted Katz to Chung's alarming

attitude. Chung replied that whether or not Van Vuuren agreed, Chung intended to proceed with

this plan.

76.     When Van Vuuren sought Katz's intervention, the lawyer vaguely suggested that

perhaps the arrangement as not technically "illegal" under the agreements with the investors,

though Katz acknowledged that the investors "likely did not anticipate" such an arrangement.

And Katz sought to gloss over Chung's behavior, assuring Van Vuuren that in fact "I know that

Patrick wants to make this marriage work, and I do believe that he will work hard to resolve the

issues" that were making life within Xfund "so difficult."

77.     And now that Van Vuuren had refused to go along with his "French divorce"

concept, Chung made daily life within Xfund doubly difficult. He repeatedly blocked Van

Vuuren's efforts to find and finance investment opportunities, while continuing his routine lacerating of Van Vuuren and Xfund's staff as incompetent. Even investors were not spared Chung's derision. Upon seeing a friendly exchange between Van Vuuren and Alan Crane of key Xfund supporter Polaris Partners, Chung emailed Van Vuuren: "Get that lazy guy [Crane] on board. The only way to do it is not to be a lazy guy yourself. We should NOT have let this go on for so long with Alan. You should have driven this harder, as everyone else around you is. Even Louis Citron [of NEA, another key supporter and Chung's former employer] is working harder than this.... Very disappointing. Please JUST GET IT DONE."

78.     Katz proposed to hold a meeting with Chung and Van Vuuren at which Katz would act as a sort of mediator or marriage counselor. And not only did Katz feel no obligation to report the rapidly developing schism to Xfund's investors, he agreed to *conceal it even from others at Ropes,* including his colleagues in Ropes's private-equity group.

79.     While attempting to set up the meeting with Katz and Chung, Van Vuuren also began to press Katz for more information about what Van Vuuren now realized was a "one-sided change" to the governance provisions from December 2014. Katz at first falsely told Van Vuuren that Ropes had received instructions from Chung only via a telephone call—implying that it was perhaps thought a matter of mere inconvenience that Van Vuuren was not on the call. But Katz then admitted to Van Vuuren that he had found a December 2014 email from Chung to Ropes instructing the lawyers to make the change. When Van Vuuren pressed Katz further, the lawyer admitted that it was clear Van Vuuren had not been copied on Chung's email to Ropes.

80.     Van Vuuren repeatedly made it clear to Katz, in a series of email, telephone and in-person discussions in the spring of 2015, (a) that in the previous December, Van Vuuren had not, in fact, agreed with Chung to make any change in the governance structure of Xfund, (b) that he had not authorized Chung to instruct Ropes to revise the documents to make such a

change, (c) that he had not known that Ropes had indeed made these changes, (d) that he had

signed the documents with virtually no opportunity for review during the year-end rush, (e) that

he had done so because he believed the only changes being made were minor and had been fully

discussed and agreed in advance, and (e) that he had been totally unaware of the governance

changes until months later. Van Vuuren told Katz that he trusted Ropes would, if needed,

provide "a very basic letter of fact/timeline that summarizes, neutrally, the series of events"

leading to the unconsented-to change.

81.     Katz did not, at any time during these conversations, suggest to Van Vuuren that

he was aware of any evidence to contradict Van Vuuren's account of the facts, or that Katz

questioned or doubted Van Vuuren's claim that he had not knowingly consented to the

governance change. Katz fully accepted as true, in these conversations with Van Vuuren in the

spring of 2015 and for many months thereafter, that Van Vuuren had been deceived—at least by

Chung—into signing the revised documents drafted by Ropes. Indeed, Katz claimed to share

Van Vuuren's reaction of surprise that the documents had been altered in the way they had, and

said he did not know why the Ropes private-equity lawyers involved in revising the documents

had not communicated with Van Vuuren, as he agreed they should have.

82.     Katz had a duty to Van Vuuren, in the spring of 2015, to provide a full and fair

disclosure of the documents and other evidence showing Ropes's involvement and complicity in

Chung's move to gain governance power over Xfund, and Ropes's failure to protect Van

Vuuren's interests. Instead, Katz deliberately concealed from Van Vuuren the full story of

Ropes's involvement. Katz did so in order to protect the lawyers involved from scrutiny and

embarrassment within Ropes, to protect Ropes from the consequences that might ensue from

disclosure of its misconduct, to protect the enormous business potential for Ropes stemming

from the connection with Xfund and its community of investors and supporters, to protect

Ropes's reputation within the Harvard community, and to protect Katz's friend Chung and

further secure his hold on power within the fund, including by diverting Van Vuuren from

discovering and actively and aggressively pursuing his legal rights against Chung and Ropes.

83.     Ropes's complicity in the December 2014 deception, of which Katz and others

within Ropes were by now fully aware, placed the firm in an unethical and untenable position of

conflicting interests. But not only did Katz fail to acknowledge to Van Vuuren that such clear

conflicts existed, Katz continued to *deepen* his and Ropes's entanglement in the emerging

dispute between Chung and Van Vuuren.

### June 2015: Katz carries out his sham "mediation" to keep Van Vuuren quiet

84.     Anxious to placate Van Vuuren and keep Ropes's misconduct under wraps, Katz

urged Van Vuuren to accept his suggestion of a secret mediation, and even offered to arrange so

that Ropes would not bill for Katz's time in the role of "mediator." While Katz paid lip-service

to the idea that Ropes was neutral in the dispute with Chung and could not represent either side,

Katz also continued to encourage Van Vuuren to confide in him about the details of his

interactions and conflicts with Chung, and represented that Katz and Ropes would keep these

communications confidential. Katz pretended to be sympathetic to the daily struggles Van

Vuuren (and the rest of the Xfund's staff) had in dealing with Chung's behavior. In an email

seeking to add further inducements for the "mediation" concept, Katz again promised to keep

everything he learned secret even from other lawyers at Ropes, and provided his personal email

address for Van Vuuren's use.

85.     Trusting Katz's assurances that he could influence Chung, Van Vuuren continued

to supply Katz with information about Chung and the atmosphere within Xfund. Van Vuuren

occasionally sought personal legal advice from Katz on issues arising from the dispute with

Chung—for example, Van Vuuren asked whether there would be legal restrictions on his ability to seek employment elsewhere if the conflict could not be resolved. Katz failed to establish or adhere to any consistent ethical limits on how he could advise Van Vuuren, or, again, to acknowledge the conflicts of interest in which Katz and Ropes were enmeshed. Instead, Katz assured Van Vuuren that the Xfund agreements would not impose restrictions on his potential employment outside Xfund, while saying he "would not want to opine" on "non-contractual restrictions" applicable to Van Vuuren, but mainly because "it is very difficult to apply common-law concepts to purely hypothetical situations."

86.     Katz also never identified any ethical inconsistency between his and Ropes's role and Katz's acting as a "mediator" between Chung and Van Vuuren. When Van Vuuren finally himself suggested that he might need his own lawyer, Katz grudgingly allowed that Van Vuuren might want to retain "a non-Ropes lawyer" if he felt "like you need a lawyer that is *exclusively* out to protect your own interests" (emphasis Katz's) and "for your own peace of mind." Katz sought to steer Van Vuuren to a former Ropes partner now at another firm. At the same time, Katz insisted that Van Vuuren not approach Xfund investors or advisors on the subject, warning that doing so would endanger not only Xfund but the reputations of those within the Harvard community who had supported it.

87.     Katz assured Van Vuuren that at the mediation he would work to restore the original governance structure of the Xfund agreements, and to have Chung commit to changing his behavior. "My goal," Katz promised, "is to help get all of this fixed up for you." Katz acknowledged that "the only workable solution for you involves both contractual and non-contractual changes being made." Van Vuuren continued to trust Katz, and expressed appreciation for his sympathy and offers of help.

### June 2015: Katz warns Van Vuuren not to challenge Chung on governance changes

88.     The "mediation" with Chung was unsuccessful: Chung made clear that he did not intend to concede anything of substance, and was counting on Van Vuuren's reluctance to embarrass Xfund's supporters and portfolio companies by going public with Chung's misdeeds. And while Katz kept up the pretense of neutrality during and after the meeting, he sought to steer Van Vuuren away from making too much of the fact that the December 2014 change in governance had unquestionably been made without Van Vuuren's knowledge or consent.

89.     Katz advised Van Vuuren in June 2015 that if he raised this issue and tried to simply restore the governance agreement to reflect what he and Chung had actually agreed, Chung would consider Van Vuuren to have "reopened" negotiations about a broad range of governance issues, and Van Vuuren might end up in a weaker position than he already was in. Katz also continued to assure Van Vuuren that there was no real reason to be concerned with the governance change, because Chung "likes you, believes in you,... respects you immensely,... doesn't want you to go anywhere and doesn't think the fund will succeed if you go anywhere,... [and] wants you to spend your energies on investments rather than legal issues with him." Katz advised Van Vuuren to satisfy himself with getting Chung to agree to a set of vague and informal "internal operating procedures."

90.     Katz's legal advice to Van Vuuren was, once again, erroneous and without any reasonable foundation. As before, Katz's real motive was to protect Chung's control over Xfund while continuing to cover up the extent of Ropes's earlier complicity in Chung's governance takeover, and preserve Ropes's lucrative business with Xfund.

### June 2015: Katz threatens to cut off communications with Van Vuuren unless he stifles his complaints about Ropes

91.     Notwithstanding Katz's efforts to downplay the subject, Van Vuuren was by this point becoming increasingly concerned about the December 2014 governance changes, which was clearly interfering with Xfund's ability to operate as a partnership, undermining internal morale, and damaging the fund's ability to support its portfolio companies and its relationships with Harvard and within other key networks. In a June 27, 2015 confidential email to Katz, Van Vuuren said that he was "disappointed and hurt," and in retrospect "really wish[ed] that" Xfund had chosen a "neutral" law firm to represent it rather than one linked by long friendship to Chung.

92.     Chung was now claiming, Van Vuuren told Katz, that Van Vuuren had been copied on communications with Ropes requesting the changes to the governance documents. Therefore, Van Vuuren asked that Katz provide him with a complete set of the communications.

93.     In response, Katz now took a different tack with Van Vuuren: Katz pretended to be surprised at Van Vuuren's "recently expressed feelings toward Ropes & Gray, including your implicit suggestion... that Ropes is not 'neutral.'" Given Van Vuuren's feelings, Katz wrote, "I don't think it is productive for either of us to continue conversing with each other on these issues right now."

94.     Katz's threat to freeze communications with Van Vuuren had its desired effect. Van Vuuren accepted Katz's advice that he should not insist that Chung agree to undo the governance changes, but should instead wait to see whether Chung complied with the informal concessions on internal procedure. By later in the day on June 30, 2015, Katz had resumed communicating with Van Vuuren, including reviewing drafts of proposed emails from Van Vuuren to Chung requesting that he agree to be more cooperative. Katz continued, however, to

withhold from Van Vuuren the documents showing the full extent of Ropes's involvement in the December 2014 secret governance change.

95.     Chung's pretense of interest in cooperation soon proved hollow. When he learned in early August 2015 of routine efforts by investors to schedule meetings with Van Vuuren, Chung angrily instructed the Xfund staff that such requests should be directed to him. Chung also angrily ordered Van Vuuren to stop investigating the December 2014 governance change: "Your unnecessary and paranoid exploration of the documents we all agreed to and signed," Chung wrote, "has cost us thousands of unnecessary dollars and I am upset by your carelessness and time-wasting around this issue." Chung continued to block new investment proposals Van Vuuren made, including sabotaging the financing of a promising Boston-based MIT healthcare company. And Chung froze funding for previously arranged projects with key outside partners at the Harvard School of Engineering and Applied Sciences and the Harvard Innovation Lab.

## October 2015: Katz and Laybourn erroneously and unethically advise Van Vuuren that Ropes did not commit malpractice

96.     Katz's ongoing efforts to keep Van Vuuren silent on the governance-change issue led to a meeting in October 2015 between Van Vuuren, Katz, and Ropes private-equity partner Peter Laybourn. As in all of Katz's dealings with Van Vuuren on the subject over the previous five months, Katz and Laybourn fully accepted in the meeting Van Vuuren's insistence that he had never in fact agreed to give Chung governance control, and had signed the documents prepared by Ropes without any knowledge of the governance change.

97.     The Ropes lawyers were forced to acknowledge the firm's complete failure to communicate with Van Vuuren in December 2014 about this critical change in control of Xfund, but professed that it was an innocent mistake. Katz and Laybourn gave Van Vuuren the legal advice that, under the circumstances that existed in December 2014, it was proper, and consistent

with normal practice, for a team of transactional lawyers to carry out a governance change

without consulting the business partner being deprived of his rights.

98.     Van Vuuren also discussed with Katz and Laybourn Chung's continuing abusive

mismanagement. Van Vuuren told the lawyers, for example, about Chung's efforts to block Van

Vuuren's investment efforts and to undermine his reputation among the investors—and to make

sure Van Vuuren knew he was doing so. To this end, Chung had even gone so far as to make an

illegal secret video recording of a meeting between Chung and an Xfund investor representative

in Chung's office, which Chung then edited to "show" how the investor was being manipulated,

and sent to Van Vuuren as an intimidation tactic. (In addition to reporting the matter to Ropes,

Van Vuuren demanded that Chung immediately remove the hidden cameras, notify anyone he

had taped, and discontinue the illegal practice.) Chung had also threatened Van Vuuren, and

another Xfund employee whom he perceived as supporting Van Vuuren, that if they failed to

comply with his wishes he would interfere with their immigration status, as both had been

granted visas that depended on their employment status.

99.     Katz and Laybourn once again advised Van Vuuren to continue trying to work

with Chung and to keep these matters under wraps.

100.     The advice Katz and Laybourn gave Van Vuuren on these subjects was erroneous,

and no reasonable and objective lawyer would have given the advice. Katz and Laybourn's

advice was driven by self-interest, and their failure to acknowledge to Van Vuuren that they

could not ethically advise him on the matters was itself negligent.

101.     Van Vuuren reasonably relied on Ropes's advice, and continued to trust that Katz

and Laybourn were being candid and truthful in reporting the relevant facts, and that continued

reliance on Ropes was Van Vuuren's best hope of salvaging his working relationship with Chung

and thus saving Xfund. While Van Vuuren had by now made clear to the Ropes lawyers how

serious he believed their misconduct had been in December 2014, Van Vuuren also candidly

took a share of responsibility himself: "I should have done more and not trusted my partners and

lawyers blindly," he wrote to Katz and Laybourn on October 30, 2015.

102.    At this point Ropes still had not provided Van Vuuren with a complete set of the

emails showing how the governance change had come about, and what role Ropes had played.

Indeed, Katz and Laybourn advised Van Vuuren that they *could not* provide the emails to him

without notifying Chung and obtaining his consent.

103.    Katz and Laybourn's advice and position, here once again, was erroneous, and

lacked any reasonable basis. Once again, the advice was motivated by Katz and Laybourn's

interest in protecting Ropes, protecting Chung, and protecting Ropes's Xfund business. Van

Vuuren reasonably accepted and relied on the advice, further hampering his ability to act to

protect his rights.

### Fall 2015: Chung moves to consolidate his power

104.    As Ropes continued working to keep Van Vuuren quiet about Chung's effective

takeover of Xfund and Ropes's role, Chung himself made further moves to solidify his power

over Xfund. As he repeatedly blocked proposed new investments developed by Van Vuuren,

Chung sought to take control of and credit for Xfund's relationships with startups brought over

from Experiment Fund—that is, relationships for which Van Vuuren was responsible. Further,

without Van Vuuren's involvement, Chung negotiated to bring into Xfund a new advisory

partner. He targeted a junior member of Harvard's faculty, drawing protests from the university's

general counsel and the dean of its School of Engineering and Applied Sciences about the need

to maintain separation between academics and commercial activity—protests which Chung

ignored. Chung also offered, and the prospect accepted, a share of Xfund's "carry," a move

prohibited by the fund's foundational documents without the assent of Van Vuuren and the

investors.

105.    Chung's abusive mismanagement and complete disregard for any pretense of

partnership reached new heights when, in December 2015, he first threatened to sell the entire

fund, and then secretly instructed the outside firm coordinating his and Van Vuuren's year-end

partnership payments to ignore the terms of the partners' agreements and pay 75% of what

remained in the capital fund to Chung, and only 25% to Van Vuuren. Van Vuuren only learned

of Chung's maneuver when the outside administrator, and Xfund's director of operations,

Kristen Ostro, brought it to his attention.

106.    Chung reacted by unilaterally deciding to terminate Ostro, over Van Vuuren's

strong objection. With Katz participating, Chung and Van Vuuren consulted a Ropes

employment lawyer about the situation. Ostro said in an email that it was clear Chung was acting

in "retaliation" for her having drawn attention to his misdirection of the year-end payments and

the "hostile work environment he had created... by actively bullying, and mentally and

emotionally abusing me and the entire team." Van Vuuren told Katz and the Ropes employment

lawyer that he agreed with Ostro's assessment. Chung remained adamant that Ostro must be

fired, and told Van Vuuren that (if it was not clear already), henceforth he would use his

governance "votes" to overrule Van Vuuren on any issue as to which the two did not agree.

107.    Katz, aware of all of Chung's misconduct, remained mainly focused on what the

Xfund investors might learn about his and Ropes's significant role over the past months in

perpetuating Chung's fraudulent hold on Xfund's governance. In a December 22, 2015 email,

Katz self-servingly and falsely proclaimed that as counsel for Xfund he had had only a "limited"

role in the fund's affairs, that he had consistently "refrained from specifically advocating for

either Hugo or Patrick," that whether or not Xfund could succeed was, "of course, out of my

control," and that indeed Katz was "entirely agnostic as to what resolution Hugo and Patrick

decide to reach."

108.    Once again, Katz's actions immediately betrayed his words. When Van Vuuren

submitted a new proposal to Chung for resolving their differences, and reiterated that Chung

should restore the balance of governance power that existed prior to December 2014, Katz leapt

to Chung's defense, insisting that he never would (or should) agree to this.

### January 2016: Ropes helps Chung manipulate internal investigation

109.    Van Vuuren realized in December 2015 that he had no choice but to formally alert

Xfund's investors—and specifically, the Limited Partners' Advisory Committee (LPAC)

appointed to represent them—to the deteriorating situation with Chung. Over Katz's desperate

urging that he not do so, Van Vuuren contacted the LPAC's leader, Lisa Edgar of Top Tier

Capital Partners. She notified the other members of the LPAC, and as the committee prepared to

meet, one of its members, Jenny Chen of Jasper Ridge, requested evidence of Chung's

mismanagement. Van Vuuren supplied some of the key emails, but meanwhile also renewed

active efforts to negotiate a resolution with Chung, providing a series of detailed written

proposals for salvaging their working relationship.

110.    Despite the fact that the situation now more than ever demanded Ropes's absolute

neutrality, Katz could not restrain himself: he baselessly warned Van Vuuren that even though he

and Xfund were still "in a common-interest relationship," Van Vuuren could not share emails

concerning the deceptive December 2014 governance change with anyone other than his

attorney. Katz and Chung then began communicating privately to square their versions of the

events of December 2014. And when a mediation session was scheduled for early January 2016,

at which both Van Vuuren and Chung would be represented by personal counsel, Katz arranged

a private meeting with Chung the night before the mediation.

111.   After Van Vuuren and Chung failed to reach an agreement, the LPAC indicated

that it would investigate Van Vuuren's allegations. But before this could occur, LPAC members

Edgar and Chen were abruptly replaced with Chung loyalists, and it soon became clear that the

new members had little interest in the merits of the Van Vuuren-Chung dispute. Indeed, one of

the new members told Van Vuuren not to provide the LPAC with any more evidence, and that

nothing he offered would be reviewed.

112.   Ropes's supposed neutrality and commitment to the interests of Xfund and its

investors were again belied by its actions. In addition to the limited information Van Vuuren had

provided to the LPAC about Chung's conduct, Katz and Ropes had crucial additional material

information about which their duty should have compelled them to report. Katz knew of Chung's

undermining of Van Vuuren's investment efforts. Katz knew of Chung's malicious threats to

Van Vuuren and Xfund staff members that he would interfere with their immigration status. Katz

knew of Chung's illegal secret videotaping of meetings at his office. And Katz knew that in

moving from NEA to Xfund Chung had concealed material information about his performance at

NEA, including serious accusations of sexual misconduct.

113.   Upon information and belief, Katz and Ropes concealed all of this information

from the LPAC, or at best vastly downplayed it. At the same time, upon information and belief,

Katz and Ropes used their access to the LPAC to take further affirmative steps to assist Chung—

principally in developing a bogus "counter-narrative" that it was Van Vuuren, not Chung, whose

behavior was suspect. In particular, upon information and belief, Katz and Ropes falsely

suggested to members of the LPAC—and supported claims by Chung—that they had actual

reason to believe that Van Vuuren was mentally unbalanced and that he might commit acts of

physical violence against them. There was no factual basis whatsoever for these insidious and

provocative claims, which any of a dozen witnesses could have readily refuted. Chung, Katz and

Ropes intended only to poison the LPAC decision-making process against Van Vuuren. Katz's

motives in taking these actions were, once again, to protect his friend Chung, and to protect

himself and Ropes, at Van Vuuren's expense.

### January 2016: More than a year too late, Ropes withdraws, and refuses to discuss its role

114.     In late January of 2016, when it was far too late, Ropes suddenly—and without

any explanation—withdrew as counsel for Xfund. Laybourn sent a letter drafted by "our general

counsel's office" which added that the firm now intended to stonewall any inquiry into its role in

the dispute between Chung and Van Vuuren: "To avoid any possibility of confusion," the letter

disingenuously asserted, "we will refrain from directly discussing our prior work with Mr. Van

Vuuren and Mr. Chung." Later that day, in an apparent final bid for sympathy from Van Vuuren,

Katz confessed in an email that he was "unbelievably depressed" about the "ordeal" with Chung.

"This has honestly been the single worst week of my entire career."

### Spring 2016: Ropes continues illicitly aiding Chung

115.     Despite its purported withdrawal, Ropes continued from behind the scenes to

assist Chung in retaliating against Van Vuuren for reporting his conduct to the LPAC, and

manipulating the LPAC's decision-making process in Chung's favor. Katz referred Chung to a

new lawyer, and through this new representative Chung issued a bizarre demand that Van

Vuuren stop any travel to the San Francisco Bay Area—in an attempt to prevent Van Vuuren

from meeting with members of the LPAC or other Xfund investors based there. Chung then

purported to "fire" Van Vuuren from Xfund, an obviously invalid maneuver whose main purpose

was to lay the foundation for fulfilling Chung's earlier threat to interfere with Van Vuuren's

immigration status.

116.    Chung also filed a legal action against Van Vuuren in California seeking an *ex*

*parte* temporary restraining order to keep Van Vuuren from attending an Xfund-sponsored event

at which its investors would be in attendance. The only "evidence" Chung offered to demonstrate

the purported need for the TRO was a self-serving "declaration" which reiterated Chung's false

claim that he had reason to fear physical violence from Van Vuuren. The declaration made clear

that Katz and Ropes were now eagerly collaborating with Chung to develop the false "fear-of-

violence" narrative, as it cobbled together excerpts from emails with Katz's lurid and fanciful

descriptions of conversations he claimed to have had with Van Vuuren—and now publicly

recounted in brazen disregard of Katz's and Ropes's ethical duty of confidentiality. Chung's

TRO action was withdrawn when Van Vuuren presented documentary evidence, along with

more than a dozen Xfund staff members and supporters prepared to testify on Van Vuuren's

behalf, to show that Chung's contentions about Van Vuuren as a supposed "danger" were

entirely unfounded.

117.    On information and belief, Katz and Ropes also supported and enabled a

simultaneous campaign by Chung to maliciously interfere with Van Vuuren's immigration status

as a further means of retaliating, intimidating, and forcing Van Vuuren out of Xfund. In June

2016, Chung maliciously arranged to have Xfund withdraw its support for Van Vuuren's United

States visa. Chung also made an utterly false report to United States immigration authorities that

Van Vuuren had "forged" Chung's signature on documents used to obtain Van Vuuren's visa. As

Katz and Ropes knew, this maneuver was a sham, and consistent with Chung's use, during Katz

and Ropes's representation of Xfund, of threats to manipulate immigration procedures as

leverage against Van Vuuren and other Xfund employees. While Katz and Ropes knew that

Chung's threats were unlawful and improper, they did nothing to prevent him from carrying out the threats or to report his actions to Xfund's investors, or to appropriate immigration authorities.

### The devastating consequences for Van Vuuren of Ropes's
### gross misconduct

118.    Ropes's surreptitious collusion with Chung to engineer his takeover of Xfund, and the law firm's cover-up, erroneous legal advice, and ongoing partisan efforts in favor of Chung substantially contributed, first, to a period of substantial underperformance by Xfund, due to Chung's mismanagement and the toxic atmosphere he created, preventing Van Vuuren and Xfund from continuing the industry-beating performance record established with Experiment Fund, and ultimately contributed to the complete collapse of the partnership between Van Vuuren and Chung.

119.    Ropes's misconduct enabled Chung to disrupt and then ignore the original equal balance of governing power—and thus the requirement of consensus—between Chung and Van Vuuren, and instead enabled Chung to transform Xfund into an instrument of his own will, something utterly foreign to its founding principles and to the investors who agreed to support Xfund.

120.    This disruption, engineered through Ropes's willing collusion, harmed Xfund itself, by interfering with its smooth operation and depriving it of valuable investment opportunities, ultimately leading to premature termination of Xfund's investment period less than 16 months after it began. What had begun as a Massachusetts- and California-based fund became solely a Silicon-Valley-based entity.

121.    Chung's improper campaign of deception and disinformation, knowingly and materially supported by Ropes, led in May 2016 to the decision of the LPAC, reconstituted to favor Chung, to allow him to continue managing Xfund without Van Vuuren's involvement.

122.     Van Vuuren was harmed by Xfund's inability to function as designed—and ultimately, after he was forced out of Xfund, by the fact that instead of reaping the deserved benefits of his lucrative contracts with Xfund, and of his successful raising of $100 million in limited-partner investments, Van Vuuren found himself cut off from these benefits and unable to fill his role in a fund that would not have existed but for him.

123.     Had Ropes conducted itself properly, Van Vuuren would still be a managing partner of Xfund, entitled to the full economic benefits of that position.

124.     The campaign carried out by Chung, with Ropes's complicity and enablement, and in particular Chung's successful smearing of Van Vuuren before Xfund's LPAC, has resulted in serious and permanent damage to Van Vuuren's reputation within the venture-capital community.

125.     Finally, Ropes's role in enabling Chung to falsely and maliciously interfere with Van Vuuren's immigration status has baselessly interfered with Van Vuuren's ability to freely travel into the United States as he had before.

## COUNT I
### (Breach of Contract)

126.     The allegations of paragraphs 1-126 are incorporated as though fully set forth herein.

127.     Van Vuuren and Ropes were parties to a contract for the performance of legal services.

128.     Ropes's misconduct as set forth above, including its surreptitiously colluding with Chung in obtaining governance of Xfund, its cover-up of the collusion, and its its partisan efforts in favor of Chung and against Van Vuuren from December 2014 onward, breached that contract.

129.    Ropes's breaches of contract caused Van Vuuren substantial financial, reputational, and other harm, and resulting damages, the amounts of which will be determined at trial.

## COUNT II
### (Negligence)

130.    The allegations of paragraphs 1-126 are incorporated as though fully set forth herein.

131.    At all relevant times, Ropes owed Van Vuuren a duty of reasonable care.

132.    On numerous occasions and in numerous respects, Ropes's conduct as set forth above breached its duty of reasonable care to Van Vuuren.

133.    Ropes's breaches of the applicable standard of care caused Van Vuuren substantial financial, reputational, and other harm, and resulting damages, the amounts of which will be determined at trial.

## COUNT III
### (Breach of Fiduciary Duty)

134.    The allegations of paragraphs 1-126 are incorporated as though fully set forth herein.

135.    At all relevant times, Ropes owed Van Vuuren fiduciary duties of utmost good faith and loyalty.

136.    On numerous occasions and in numerous respects, Ropes's conduct as set forth above breached its fiduciary duties to Van Vuuren.

137.    Ropes's breaches of fiduciary duty caused Van Vuuren substantial financial, reputational, and other harm, and resulting damages, the amounts of which will be determined at trial.

## COUNT IV
### (Aiding and Abetting and Civil Conspiracy)

138.     The allegations of paragraphs 1-126 are incorporated as though fully set forth herein.

139.     At all relevant times, as co-founder with Van Vuuren of Xfund, Chung owed Van Vuuren fiduciary duties of utmost good faitComplh and loyalty.

140.     Ropes's conduct as set forth above constituted aiding and abetting of Chung and conspiring with him in breaching his fiduciary duties to Van Vuuren.

141.     Ropes acted with knowledge that Van Vuuren and Chung had formed Xfund as equal partners and that they each owed fiduciary duties to each other. Ropes acted with knowledge of Chung's breaches of his fiduciary duties to Van Vuuren. Ropes actively participated in, substantially assisted in, and encouraged Chung's breach of his duties to Van Vuuren, and did so to such a degree that Ropes cannot reasonably have been acting in good faith.

142.     Ropes's aiding and abetting and conspiracy caused Van Vuuren substantial financial, reputational, and other harm, and resulting damages, the amounts of which will be determined at trial.

## COUNT V
### (Violation of M.G.L. ch. 93A)

143.     The allegations of paragraphs 1-126 are incorporated as though fully set forth herein.

144.     Ropes was engaged in trade or commerce in the Commonwealth of Massachusetts at all relevant times.

145.     Ropes's conduct toward Van Vuuren as set forth above was unfair and deceptive within the meaning of M.G.L. c. 93A, § 2, and was therefore unlawful.

146.     The actions constituting Ropes's violation of M.G.L. c. 93A occurred primarily and substantially within the Commonwealth of Massachusetts.

147.     Ropes's unfair or deceptive acts or practices were willful, knowing and intentional violations of M.G.L. c. 93A.

148.     Ropes's unfair or deceptive acts or practices have caused Van Vuuren to suffer damages, including economic harm, injury to his reputation and other damages.

149.     Van Vuuren is entitled to recover actual damages, and up to two or three times that amount for Ropes's willful, knowing and intentional violation of M.G.L. c. 93A, plus Van Vuuren's reasonable attorneys' fees and costs incurred in bringing this claim.

## **PRAYERS FOR RELIEF**

WHEREFORE, plaintiff prays that this Court:

1.     Enter judgment in Van Vuuren's favor and against Ropes on all counts of this Complaint;

2.     Award Van Vuuren all damages he sustained as a result of Ropes's conduct;

3.     Award Van Vuuren multiple damages and attorneys' fees pursuant to Count V;

4.     Award Van Vuuren his costs; and

5.     Grant such further relief as this Court deems just and proper.

## PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL CLAIMS SO TRIABLE

February 7, 2018

HUGO VAN VUUREN
By his attorneys,

/s/ David J. Miclean
DAVID J. MICLEAN
dmiclean@micleangleason.com
(*pro hac vice* admission to be sought)
DANIELLE M. MIHALKANIN
dmihalkanin@micleangleason.com
(*pro hac vice* admission to be sought)
MICLEAN GLEASON LLP
411 Borel Avenue, Suite 310
San Mateo, CA 94402
Telephone: (650) 684-1181
Facsimile: (650) 684-1182

/s/ David A. Barry
DAVID A. BARRY (BBO #031520)
barry@sugarmanrogers.com
WILLIAM L. BOESCH (BBO #558742)
boesch@sugarmanrogers.com
SUGARMAN, ROGERS, BARSHAK & COHEN, P.C.
101 Merrimac Street, Suite 900
Boston, MA 02114
Telephone (617) 227-3030
Fax (617) 523-4001

4815-5408-8794, v. 6